IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| MURRAY E. JOINER, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:18-cv-00863 |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| MEHARRY MEDICAL COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Pending before the Court are two motions for Summary Judgment. Plaintiff moved for summary judgment[1] (Doc. No. 32, "Plaintiff's Motion"), and Defendant moved for summary judgment (Doc. No. 34, "Defendant's Motion"). Plaintiff filed a Response to Defendant's Motion, (Doc. No. 39), and Defendant filed a Response to Plaintiff's Motion (Doc. No. 42). Plaintiff filed a Reply in support of Plaintiff's Motion (Doc. No. 43), and Defendant filed a Reply in support of Defendant's Motion (Doc. No. 46). The matter is ripe for review. For the reasons discussed herein, the Court will deny Plaintiff's Motion, and grant Defendant's Motion.

## BACKGROUND[2]

Located in Nashville, Meharry Medical College ("MMC" or "Defendant") is a historically black academic health science center which educates physicians, dentists, researchers, and health

---

[1] As will be discussed, though stylized as a motion for summary judgment, Plaintiff's motion was in fact a partial motion for summary judgment.

[2] Unless otherwise noted, the facts in this section are taken from facts in the Complaint and the parties' Responses to Statements of Undisputed Facts (Doc. Nos. 1, 39-1, 41). Unless indicated otherwise, the facts set forth in this section are undisputed. Thus, the facts set forth here are either undisputed or specifically identified as disputed.

policy experts. (Doc. No. 41 at ¶ 1). Meharry includes a medical school, dental school, graduate school, and a center for health policy. (*Id.*). Meharry confers several advanced degrees. (*Id.* at ¶ 2). This dispute arises out of Plaintiff's dismissal from MMC, specifically the Meharry School of Medicine ("SOM"), and the handling of a sexual harassment allegation Plaintiff made while attending MMC.

A. Plaintiff's Academic Performance

Plaintiff had previously received a Bachelor's of Science degree in biochemistry from Oakwood University. (*Id.* at ¶ 4). Plaintiff applied to the SOM to be in the class of 2019, but his application was deferred, and he instead enrolled in Meharry's Master of Health Science ("MHS") program in fall of 2015. (Doc. No. 39-1 at ¶¶ 1, 2). The MHS program is a one-year program offered for approximately 35 students each year who have been deferred admission from the SOM. (*Id.* at ¶ 3). Plaintiff completed the coursework for the MHS program, but he did not receive a sufficient grade point average to receive a degree from the program. (*Id.* at ¶ 4). Though appearing to recognize that his grade point average *as listed by Meharry* was too low to receive a degree, Plaintiff disputes that he did not earn a sufficient grade point average, as he claims that he received an incorrect grade. (*Id.*). Despite a clear appeal policy whereby he could have appealed, Plaintiff never appealed his allegedly incorrect grade. (*Id.* at ¶ 5, 6).

In summer 2016, Plaintiff was informed that he was on the waiting list for the SOM, and then shortly thereafter he was informed that he had been accepted into the SOM. (*Id.* at ¶¶ 12, 13). Plaintiff paid tuition and other fees for the 2017-2018 academic year. (*Id.* at ¶ 16). The SOM prescribes a four-year curriculum divided into two phases: Phase I includes a six-week Mini Academic Program for Success ("MAPS") and two years of coursework including basic science

2

courses, and Phase II includes two more years of coursework and clinical work. (Doc. No. 39-1 at ¶ 9).

In August 2016, Plaintiff was informed that he failed two modules of the MAPS program, and he was told to formulate a remediation and schedule an appointment with Meharry's Center for Educational Development and Support ("CEDS"). (*Id.* at ¶ 11). A professor testified at a deposition that it is uncommon to fail any module of MAPS. (*Id.* at ¶ 12).

On September 8, 2016, Plaintiff was informed that he failed the first block of exams in three of his courses, and he was again advised to create a remediation plan and schedule an appointment with CEDS. (*Id.* at ¶ 13). Less than a week later, Plaintiff was asked to meet with Dr. Stephanie McClure, Meharry's Senior Associate Dean, Office of Student Academic Affairs for the SOM ("Dr. McClure"), in regard to his academic difficulties and an apparent lack of professionalism. (*Id.* at ¶ 14). Dr. McClure testified that Plaintiff was perceived to lack professionalism because he had been disrespectful to a faculty member, talked back to a faculty member when asked to remove a hat, and watched unrelated videos during a class. (*Id.* at ¶ 15). During this meeting, Dr. McClure recommended Plaintiff "decelerate" his medical school track, in order to take a lighter course load and graduate in five years instead of four. (*Id.* at ¶¶ 16, 17). On October 10, 2016, Plaintiff was informed that he failed the second block of exams in two courses. (*Id.* at ¶ 19). On November 17, 2016, Plaintiff was informed that he failed his fourth block exams in one course. (*Id.* at ¶ 20). Plaintiff's grade point average for the first semester of medical school was a 2.0. (*Id.* at ¶ 21).

On January 20, 2017, Plaintiff was informed that he had failed the first block of exams in one of his courses. (*Id.* at ¶ 22). Plaintiff was called before the March 10, 2017 meeting of the Student Academic Support Services Committee ("SASSC") as a result of his grade in a course.

(*Id.* at ¶ 23). On March 13, 2017, Plaintiff was informed that he had failed the first block of exams in one of his courses and was warned of his poor performance in another course. (*Id.* at ¶ 24). Plaintiff was called before another meeting of the SASSC in April as a result of a low grade in another class. (*Id.* at ¶ 25). Shortly thereafter, Plaintiff was informed he had failed the second block of exams for one course, and he was required to meet with Dr. Digna Forces, Associate Dean of Medical Education because he had failed to ever schedule an appointment with CEDS. (*Id.* at ¶ 26). Later in April, Plaintiff was informed he failed a third block of exams for one course. (*Id.* at ¶ 27). Plaintiff's GPA for his second semester was a 2.51. (*Id.* at ¶ 28).

Plaintiff was subsequently referred to the Student Evaluation and Promotion Committee ("SEPC") and had a hearing on September 11, 2017. (*Id.* at ¶ 30). The SEPC decided Plaintiff would have to repeat two courses during fall 2018 (the next time the courses were offered). (*Id.*). In September, Plaintiff was informed he failed a midterm in one of his courses. (*Id.* at ¶ 31). In November, Plaintiff was informed that he had failed 10 credit hours of courses and a new hearing with SEPC was scheduled for later in November. (*Id.* at ¶ 32). Plaintiff was informed that if a student failed 12 or more credit hours they would be recommended for dismissal due to poor academic performance, and Plaintiff was told if he failed Urinary Systems, a three credit-hour course, he would be dismissed from the SOM. (*Id.* at ¶¶ 33, 34). Plaintiff claims that at this point he asked to withdraw from medical school but was advised to remain, though Dr. McClure does not recall Plaintiff ever asking to withdraw. (*Id.* at ¶¶ 35, 36). On December 8, 2017, Plaintiff was informed that he had failed Urinary Systems and was being dismissed from the SOM. (*Id.* at ¶ 37). Plaintiff does not dispute that he failed four classes totaling more than 12 credit hours during the fall 2017 semester. (*Id.* at ¶¶ 38, 39).

4

Plaintiff was informed that he could appeal his dismissal within five business days to Dean Mallett, the Dean of the SOM (the "Dean"). He also was advised that his appeal should be based on "compelling reason, bias, or failure to follow due process," but that the Dean would not rehear the merits of his claim. (Doc. No. 41 at ¶¶ 40, 41). Plaintiff, who had returned home after his dismissal, flew to Nashville for an in-person appeal hearing, which was cancelled twice. (*Id.* at ¶ 50). Plaintiff claims that he ended up making his appeal over the phone when the Dean called him while he was out shopping with his family, (*Id.* at 51), but Defendant characterizes this phone call as a mere discussion. (Doc. No. 41 at ¶ 43). The student manual does not require the Dean to meet with dismissed students in person or by telephone prior to rendering a decision on the appeal. (Doc. No. 39-1 at ¶ 45). After the conversation, Plaintiff emailed the Dean to explain his poor academic performance, took responsibility for his dismissal, and did not mention any sexual harassment. (*Id.* at ¶ 46). The Dean upheld the decision to dismiss Plaintiff from the SOM. (*Id.* at ¶ 47).

B. <u>Plaintiff's Allegations of Sexual Harassment</u>

During his fall semester, Plaintiff was repeatedly harassed by another student which was observed by other members of Plaintiff's small group ("Student M").[3] (Doc. No. 41 at ¶¶ 18, 19). Plaintiff's small group met four times a week for approximately four hours a day, studying on campus. (*Id.* at ¶ 20). In his testimony, Plaintiff states that Student M would touch him inappropriately, make sexual comments, and make him uncomfortable. (*Id.* at ¶¶ 21, 22, 23).

---

[3] Plaintiff does not remember the student's last name. He told Defendant (via Defendant's examining attorney) the first name of the student for the first time during his deposition. (Doc. No. 39-1 at ¶ 64). Though Defendant refers to the student by his first name in briefing, the Court has chosen to refer to him by Plaintiff's moniker for him, "Student M."

Plaintiff specifically states that Student M spanked him at an off-campus birthday party and grabbed his thigh in an Uber. (*Id.* at ¶¶ 24, 25).[4]

Plaintiff reported inappropriate conduct on January 31, 2017, to Shana Hill, an Assistant Dean in Meharry's Office of Student and Academic Affairs. (Doc. No. 39-1 at ¶ 71). Plaintiff does not recall previously complaining about the inappropriate conduct. (*Id.* at ¶ 81). Plaintiff met with Dr. McClure and Ronette Adams, Meharry's Title IX Compliance Officer ("Title IX Officer"), and he was moved into a different small group the same day. (Doc. No. 41 at ¶ 26; Doc. No. 39-1 at ¶ 75). At the meeting, Plaintiff reported Student M grabbing his thigh, spanking him, and other improper conduct. (Doc. No. 41 at. ¶ 27).

Plaintiff told Dr. McClure identifying information about Student M, such as that he was homosexual, a "social chair," and on the Executive Board.[5] (*Id.* at ¶ 28). Despite knowing the first name of Student M, Plaintiff never revealed Student M's name to Defendant. (Doc. No. 39-1 at ¶ 64-67, 90). Plaintiff alleges that Defendant knew the identity of Student M from this information, but Defendant denies that it had identified Student M at this time. (Doc. No. 41 at ¶ 28). There are facts in the record that indicate that the identity of Student M would have proved easy to discover, and some facts that indicate that it may have been difficult. An employee of Defendant testified in a deposition that "social chair," the descriptor given by Plaintiff of his harasser, is not a position that exists. (Doc. No. 39-1 at ¶ 92; Doc. No. 36-2 at 11). However, it is undisputed that Dr.

---

[4] In his Statement of Undisputed Facts, Plaintiff provides the Court with names of witnesses at these events. Defendant admits that this was Plaintiff's testimony but denies the statements to the extent they imply that Defendant was aware of the witnesses' names prior to Plaintiff's deposition. (*Id.* at ¶¶ 24, 25).

[5] The parties also regularly refer to this as "the E-board" in their briefing. For consistency, the Court will refer to it as the "Executive Board." The Executive Board is selected by the members of the student class, and it appears to be a type of extracurricular or student governing body. (Doc. No. 39-1 at ¶ 94).

6

McClure could have found out who was on the Executive Board by contacting student services. (Doc. No. 41 at ¶ 29). Plaintiff alleges that Student M was the only homosexual person on the Executive Board, which comprised approximately 15 people from each class. (Doc. No. 39-1 at ¶¶ 93, 95). However, Dr. McClure testified that she is aware of several homosexual men in Plaintiff's class, although she does not know any who are openly gay. (*Id.* at ¶ 96). Notably, Plaintiff admitted during his deposition that he wanted the administrators to go on a "fishing expedition" to identify the student. (*Id.* at ¶ 98).

After their meeting, Dr. McClure emailed Plaintiff stating that, unless he named the student, "we're pretty much stopped where we are." (Doc. No. 41 at ¶ 30). Dr. McClure also informed Plaintiff that he should let her know if placing him in a different small group did not resolve the matter. (Doc. No. 39-1 at ¶ 77). Ms. Hill also emailed Plaintiff informing him that the SOM prohibits retaliation, and Plaintiff responded that he would "think about giving the name but at this time I'm ok with this solution." (Doc. No. 39-1 at ¶¶ 72, 73).

Dr. McClure's office received at least two academic status letters indicating that Plaintiff was struggling academically, but Dr. McClure did not make a connection between this and the sexual harassment. (Doc. No. 41 at ¶¶ 34, 35). Plaintiff never informed Dr. McClure that his poor academic performance was related to being harassed. (Doc. No. 39-1 at ¶ 79).

No discipline was imposed on Student M. (*Id.* at ¶ 36). Plaintiff alleges that the harassment continued. (*Id.* at ¶ 37). However, Plaintiff never informed Dr. McClure or Ms. Hill that moving to a different small group had not alleviated his harassment. (*Id.* at ¶ 84). Plaintiff complained of the harassment only to fellow students. (*Id.* at ¶ 85).

Plaintiff claims that he would have been treated differently if he were a woman. (*Id.* at ¶¶ 86, 87). However, Plaintiff is not aware of any female students at MMC who complained of sexual

harassment and were treated differently. (*Id.* at ¶ 89). Plaintiff did testify that he knew of a professor who was accused of sexual harassment who was subsequently fired, and he implies that the treatment of this alleged harasser, as compared with the (non-existent) treatment of Plaintiff's alleged harasser, shows disparate treatment of Plaintiff in his capacity as a victim of sexual harassment. (Doc. No. 41 at ¶ 39; Doc. No. 39-1 at ¶ 23).

Plaintiff's Complaint brings several counts against Defendant: I) breach of contract, including a breach of obligation to conduct an investigation, to provide an education, to abstain from arbitrary punishment, and to provide an appeal; II) promissory estoppel; III) intentional infliction of emotional distress; IV) negligence; V) negligent infliction of emotional distress; VI) gross negligence; VII) negligent training and supervision of employees; VIII) declaratory judgment under Title IX; IX) selective enforcement of Title IX; X) deliberate indifference under Title IX; and XI) violation of Title IX because of an erroneous outcome.

Plaintiff seeks various forms of relief, requesting that this Court 1) require Defendant to confer a Master's Degree in Health Sciences on Plaintiff, 2) require Defendant to change various grades of Plaintiff, 3) set aside the decision to dismiss Plaintiff from the SOM, 4) declare the sexual harassment policies of Defendant to be contrary to Title IX as implemented against Plaintiff, 5) require Defendant to re-enroll Plaintiff as a second year medical student, 6) award compensatory damages, 7) award attorney's fees, and 8) award prejudgment interest.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that

8

there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248, 106 S. Ct. 2505. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]' " *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 628.

The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury

9

could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

**DISCUSSION**

Plaintiff's Motion requests summary judgment on his claims of breach of contract, promissory estoppel, and violation of Title IX (specifically, his counts of selective enforcement and deliberate indifference). (Doc. No. 32 at 1). Defendant's Motion requests summary judgment on all claims. (Doc. No. 35). Defendant notes in its Response to Plaintiff's Motion that Plaintiff, despite never having moved this Court for permission to file a motion for partial summary judgment, included arguments regarding summary judgment for only three of the eleven counts in his Complaint. (Doc. No. 42 at 1). Plaintiff then used the entirety of his Reply to ask the Court (belatedly) for permission to have filed a motion for partial summary judgment, claiming that he had intended that his other claims not be waived but rather resolved by a jury because he believes them to involve questions of material fact. (Doc. No. 43). The Court does not deem Plaintiff to have waived the counts that he did not address in Plaintiff's Motion. However, as discussed below, the Court disagrees with Plaintiff that these claims turn on questions of material fact, and the Court will grant summary judgment to Defendant on all claims.

The Court will address each claim in turn.

A. Breach of Contract

In Tennessee, "[t]he essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (quoting *Custom Built Homes v. G.S. Hinsen Co.*, No. 01A01-9511-CV-00513, 1998 WL 960287, at *3 (Tenn. Ct. App. Feb. 6, 1998)). A contract can

10

be either express or implied. *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990).

Plaintiff and Defendant each assert entitlement to summary judgment on Plaintiff's contract claims. Plaintiff argues that there was an enforceable contract because Plaintiff paid tuition, fees, and expenses to Defendant. (Doc. No. 33 at 6). Plaintiff claims that he made such payments

> in reliance on the understanding and with the reasonable expectation that the Defendant would provide education and instruction to him as well as abstain from arbitrarily imposing punishment that would prevent [Plaintiff] form securing his degree, or that interfered with his education, in an unfounded manner or on an arbitrary basis. [Plaintiff] also had a reasonable expectation that Defendant would implement and enforce the policies made in its official publications of the college.

(*Id.*). Plaintiff also notes that an expert has stated that Plaintiff incurred $32,476,162 in damages as a result of his dismissal from the SOM. (*Id.* at 9). Defendant counters that it was not in a contractual relationship with Plaintiff, due to limiting language in the School of Medicine Student Academic Policies and Procedures Manual ("SOM manual"), and that his damages are speculative. (Doc. No. 35 at 19-23).

a. Existence of an enforceable contract

The Court notes at the outset that "this case arises in an academic context where judicial intervention in any form should be undertaken only with the greatest reluctance." *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 576 (6th Cir. 1988) (citing *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 226 (1985) (noting that federal courts are unsuited "to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions")). "This is the case especially regarding degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as

11

qualified to pursue his chosen profession." *Id.* A failing grade is subject to substantial deference from the courts as an academic decision. *Sifuna*, 2018 WL 3005814, at *2.

However, a challenge to a disciplinary action requires a more "intrusive analysis" than does a challenge to an academic action. *Doherty*, 862 F.2d at 577; *Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 255 (6th Cir. 2005) (quoting *Doherty*). "[A] student may raise breach of contract claims arising from a university's alleged failure to comply with its rules governing disciplinary proceedings." *Anderson v. Vanderbilt Univ.*, 450 F. App'x 500, 502 (6th Cir. 2011). However, even when evaluating a disciplinary action, the role of the court is "substantially circumscribed"; it is not the role of the court to retry a case or "advocate for best practices."[6] *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 672 (M.D. Tenn. 2018), *appeal dismissed*, No. 19-5061, 2019 WL 3202209 (6th Cir. Apr. 26, 2019) (quoting *Doe v. Univ. of the S.*, 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009) and *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015)).

When applying Tennessee law, the Sixth Circuit has stated that "the student-university relationship is contractual in nature although courts have rejected a rigid application of contract law in this area." *Sifuna v. S. Coll. of Tennessee, Inc.*, No. 17-5660, 2018 WL 3005814, at *2 (6th Cir. Apr. 5, 2018) (quoting *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988)). The Tennessee Supreme Court has not identified a standard to apply when a dispute arises out of a university/student relationship, but the Sixth Circuit has stated that it believes that the Tennessee Supreme Court would apply a deferential standard of "reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." *Doherty*, 862 F.2d at 577 (quoting *Lyons v. Salve Regina Coll.*, 565 F.2d 200, 202 (1st Cir.

---

[6] Though this case law most frequently arises when one accused of sexual misconduct wishes to later contest the disciplinary process in court, the Court sees no reason why the same principles would not apply to the case at bar.

1977)); *Anderson*, 450 F. App'x at 502 (noting the likely applicability of this standard to an implied contract).

Courts have regularly found implied contracts, between a school and student, from a school publication, even when that publication contains disclaimer language.[7] *E.g.*, *Atria*, 142 F. App'x at 255 (finding that language in the handbook that the policies "are not intended to be all-inclusive and do not constitute a contract" prevented an express contract, but allowed for an implied contract); *Doe v. Vanderbilt Univ.*, No. 3:18-CV-00569, 2019 WL 4748310, at *12 (M.D. Tenn. Sept. 30, 2019) (citing *Atria*); *Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 890 (M.D. Tenn. 2018) ("Because the Bruin Guide attempts to disclaim its entire contractual force, the Court will not consider the disclaimer, and utilizes the Bruin Guide as defining the terms of the implied contractual relationship between Doe and Belmont."). "Catalogs, manuals, student handbooks, bulletins, circulars and regulations of a university help define the implied contractual relationship." *Doe v. Vanderbilt Univ.*, 2019 WL 4748310, at *12 (citing *Atria*).

Despite the clear agreement of most courts, Defendant encourages this Court to adopt a different approach and find no implied contract between Plaintiff and Defendant due to limiting language in the SOM manual.[8] In support of its suggestion, Defendant cites two cases. (Doc. No.

---

[7] The Court pauses to note that there are two kinds of implied contracts: contracts implied in fact, and contracts implied in law. *Stahl v. United States*, 141 Fed. Cl. 396, 404 (2018). The latter kind is said to exist when the claimant has a valid promissory estoppel theory. *See id.* ("Promissory estoppel is another name for an implied-in-law contract claim."). In this case, Plaintiff alleges both kinds, (Doc. No. 1 at 7); as discussed below, he asserts a promissory estoppel theory. But here the Court is addressing his claim of a contract implied in fact.

[8] The SOM manual states: "This manual does not constitute a contract, express or implied, between any student or faculty member and [SOM]. The College reserves the right to request or require the withdrawal of any student who does not attain and maintain adequate academic or clinical performance or who does not exhibit the personal and professional qualifications prerequisite for his/her chosen discipline of study." (Doc. No. 32-3 at 517).

13

35 at 20). In the first case, the Sixth Circuit indicated that it was difficult to find a binding contract that would not allow a school to change its graduation requirements when a catalog contained disclaimer language. *Doherty*, 862 F.2d at 577.[9] In the second case, a Tennessee court noted in dictum that the language in a Meharry guidebook does "not contain binding representations or agreements by Meharry," because of a disclaimer included therein. *Lord v. Meharry Med. Coll. Sch. of Dentistry*, No. M200400264COAR3CV, 2005 WL 1950119, at *4 (Tenn. Ct. App. Aug. 12, 2005) (noting that plaintiff had not brought implied contract claim but the court would decline to find an implied contract). The Court is unpersuaded that it should adopt the approach of these two cases, each of which involved only dicta on the relevant issue, when the clear majority of cases

---

[9] Though at first glance the language in *Doherty* might seem determinative in this case, *Doherty* did not hold that disclaimer language negated an implied contractual relationship between a student and university. The court in that case did state that "[i]n view of the disclaimer language on the inside front cover of the catalog, it is difficult to find, as plaintiff asserts, that a binding contract was created promising the SCO class entering in 1978 the right to graduate determined under the standards in the 1978–79 catalog." *Id.* at 577-78. However, instead of focusing on whether a contractual relationship existed, as is the question here, the court was discussing that, in the context of setting degree requirements, a school is not held to a binding or unchangeable contractual requirement as to those requirements. *Id.* at 578. The court proceeded as if an implied contract existed and applied the "reasonable expectation" standard to determine whether such contract encompassed the particular promise the plaintiff claimed it encompassed (*i.e.*, a promise "that the SCO class entering in 1978 the right to graduate determined under the standards in the 1978–79 catalog.") The court answered that question in the negative based on the reasonable-expectation standard. *Id.* ("Applying the "reasonable expectation" . . . we believe it was reasonable for SCO, given the disclaimer printed in the front of its handbook and the practice of prospective application of curriculum changes, to expect the students to anticipate and comply with curriculum changes affecting their remaining years at the school. SCO's modification of the degree requirement to include a clinical proficiency in the four instruments was reasonable."). Therefore, the court in *Doherty* did treat the relationship between the student and university as contractual, but it also found that the disclaimer language contributed to the school's ability to change graduation requirements while a student was enrolled, contrary to what the plaintiff claimed (ultimately unsuccessfully) was a promise to make no such changes. *Id.* Additionally, the Court notes that many other cases, including some in the Sixth Circuit as discussed, have embraced the opposite of the proposition for which Defendant cites *Doherty*.

14

(including from the Sixth Circuit) have found that an implied contract is present between a university and student.

Therefore, the Court finds that there was no express contract between the parties. However, the Court finds that there was an implied contract.[10] This implied contract is defined by the terms of the SOM manual.[11] *Doe v. Vanderbilt Univ.*, 2019 WL 4748310, at *12; *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d at 689.

    b.  Breach of contract

       1.  Handling of Plaintiff's Sexual Harassment Allegation

---

[10] Defendant contends, without citation, that it has no obligation to conduct an appropriate and unbiased investigation into Plaintiff's sexual harassment allegations, other than the obligation mandated by Title IX. (Doc. No. 35 at 20). Despite Defendant's unsupported contention, courts have regularly found implied contracts from schools' sexual misconduct policies. *E.g.*, *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d at 691 (discussing Title IX claims and implied contract claims based on school's sexual harassment policy).

[11] In his Complaint, Plaintiff calls this a "Student Handbook" and refers to two different handbooks (one for the year 2016/2017 and one for the year 2017/2018). (Doc. No. 1 at 7). In his briefings, Plaintiff again references plural "Student Handbooks." (Doc. No. 39 at 6; Doc. No. 33 at 6). Defendant also once references more than one handbook, and it includes a reference to a previous version (2015-2016) of the document. (Doc. No. 35 at 4). Later in his briefings, Plaintiff provides a citation to a singular "Handbook" for the sexual misconduct policy. (Doc. No. 39 at 7; Doc. No. 33 at 7). There appears to only be one document put into the record in this case (by both Plaintiff and Defendant) that the parties are talking about: it is entitled "School of Medicine Student Academic Policies and Procedures Manual" and includes the year 2017 on the front cover. This document was submitted by Plaintiff, (Doc. No. 32-3 at 512), and also by Defendant, (Doc. No. 36-4). Plaintiff and Defendant have given the Court no reason to believe that this is not the document to which they refer or that there is an additional document, despite occasional references to more than one document. The Court will cite herein to the version of the document submitted by Plaintiff. The version submitted by Defendant contains missing pages of relevant information (some of which Defendant cites to in its briefing). Plaintiff submitted the document as part of a lengthy "exhibit binder," and the Court's citation will be to the page numbers shown by the Clerk's office stamp, irrespective of the original pagination.

Plaintiff argues that Defendant did not investigate his sexual harassment complaint. (Doc. No. 33 at 8). Plaintiff claims that no reasonable jury could conclude anything other than that Defendant "breached its implied contract with [Plaintiff] by failing to investigate his complaint, by failing to discipline the offending student, and by failing to consider the effects of the sexual harassment on Mr. Joiner's academic performance prior to recommending his dismissal." (*Id.*). Defendant claims that it did investigate Plaintiff's allegations. (Doc. No. 35 at 20). Though the parties disagree regarding whether an investigation occurred, neither party points the Court to any dispute of material fact regarding the handling of the sexual harassment allegation.[12]

In the present case, as discussed below, the SOM's sexual misconduct policy entitles students to an investigation, but it makes no specific guarantees about that investigation and references the investigation only in the broadest of terms. In such circumstances, a plaintiff cannot establish that he or she was contractually entitled to certain specific steps or processes in that investigation. In one case, a court did not find a violation of an implied contract when the Sexual Misconduct Policy "contains few requirements regarding how [the relevant department] must conduct an appropriate substantive investigation, including no specific requirements regarding how [the relevant department] must utilize, evaluate, and accept or reject testimony or other evidence. Instead, the Sexual Misconduct Policy requires only that an investigation be conducted in the broadest sense." *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d at 691. Additionally, the court in

---

[12] Plaintiff points to the fact that Dr. McClure and Dr. Samuels indicated that they did not know whether the reluctance to provide a name absolved the SOM from its duty to investigate. (Doc. No. 41 at ¶¶ 31, 31). Defendant admitted the accuracy of Plaintiff's characterization of these witnesses' testimony for purposes of summary judgment, but it objected on the grounds that whether these employees had such knowledge is not material and calls for a legal conclusion. (*Id.*). The Court agrees; any such "knowledge" would actually be a mere legal conclusion—really nothing more than a lay opinion regarding the application of the law to the facts. Thus, the Court will not consider this particular issue further.

16

that case emphasized the discretion the investigator was given and found that "[plaintiff's] disappointment . . . is an insufficient basis for a breach of contract claim." *Id.* at 692 (collecting cases holding similarly); *see also Schaumleffel v. Muskingum Univ.*, No. 2:17-CV-463, 2018 WL 1173043, at \*11 (S.D. Ohio Mar. 6, 2018) (pretermitting plaintiff's claim that specific actions not included in the handbook should have been taken in investigating a sexual assault complaint); *Doe v. Belmont Univ.*, 334 F. Supp. 3d at 894 (finding that handbook required no specific requirements for the investigation and that plaintiff could not challenge the adequacy of the investigation due to being dissatisfied with it). *Cf. Doe v. Univ. of S.*, No. 4:09-CV-62, 2011 WL 1258104, at \*19 (E.D. Tenn. Mar. 31, 2011) (not granting summary judgment for either party, when dispute as to material fact existed because the policy contained many specific (and allegedly unsatisfied) procedural requirements for an investigation).

In the SOM manual, MMC defines "sexual harassment" as:

> [U]nwelcome verbal or physical conduct of a sexual nature that has the effect of unreasonably interfering with an individual's work or academic performance or that creates an intimidating, hostile, or offensive working, educational, or living environment. A form of quid pro quo (this for that) sexual harassment exists when submission to or rejection of unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature results in adverse educational or employment action, or the threat of such adverse action, or limits or denies an individual's educational or employment access, benefits or opportunities.

(Doc. No. 32-3 at 571). The SOM manual clearly entitles students to a "prompt investigation" which is "thorough and impartial and conducted in a manner in which the Title IX investigator deems appropriate." (*Id.* at 574). The SOM manual also states that "[i]f a complainant requests confidentiality or asks that the compliant [sic] not be pursued, MMC will take all reasonable steps

17

to conduct the investigation and respond to the complaint within the conditions requested."[13] (*Id.*). However, the SOM manual contains no definition regarding what an "investigation" entails or how such an investigation will be conducted. The SOM manual refers only to an investigation being conducted, in broad terms; the SOM manual contains no provisions or promises of any specific requirements for an investigation (such as collecting evidence, interviewing witnesses, etc.), other than that the investigation will be "prompt," "thorough," and "impartial," with discretion left to the investigator. (*Id.*).

Plaintiff additionally relies on language in the "Rights afforded to Sexual Assault Complaint." The Court notes that it is not clear that this section even applies to Plaintiff, since he made a complaint of sexual harassment rather than sexual assault. However, even if this section does apply, it undercuts Plaintiff's argument by defining the final "Right" a follows: "The right to file a complaint on campus and to avail him/herself of the process for doing so including, but not limited to, adequate reliable, and impartial investigation of the complaint; an equal opportunity to present relevant witnesses and other evidence." (*Id.* at 573). This "Right" grants the same general right to an investigation granted elsewhere, but then indicates that *the student* has the opportunity to present witnesses and other evidence. Here, Plaintiff did not avail himself of this opportunity

---

[13] The Court agrees that this section indicates that an investigation should be undertaken even if a complainant does not wish to pursue a complaint. But Plaintiff also apparently relies on this section to imply that the school had a duty to discipline Student M, (Doc. No. 33 at 7-8), and any such reliance on this section is misplaced. This section of the SOM manual, focusing on confidentiality, refers to a situation in which a complainant (*i.e.*, Plaintiff), wishes *his or her* (*the complainant's*) identity to remain confidential. This section does not deal with the situation at issue here, where a complainant refuses to divulge *the identity of his or her harasser*. The SOM manual contains no provision, as far as the parties have indicated, regarding a complainant refusing to divulge the identity of his or her harasser. Additionally, the language in this section regarding punishment is permissive rather than mandatory, noting that Defendant "*may* pursue other steps." (Doc. No. 32-3 at 574) (emphasis added). This permissive language would not create a promise to punish a harasser and (again) leaves Defendant with discretion.

(despite being offered it multiple times by Defendant); to the contrary, he refused to divulge the name of his harasser and indicated that he was satisfied with the solution.

It is undisputed that the same day Plaintiff made his complaint, he was able to meet with Dr. McClure and the Title IX Officer and was moved into a different small group. (Doc. No. 41 at ¶ 26; Doc. No. 39-1 at ¶ 75). Dr. McClure followed up with Plaintiff and asked him to provide the name of the harasser. (Doc. No. 39-1 at ¶ 77). Ms. Hill also followed up with Plaintiff and asked him to provide the name of the harasser. (*Id.* at ¶ 72). In response to the email from Ms. Hill, Plaintiff stated he would "think about giving the name but at this time I'm ok with this solution." (*Id.* at ¶ 73). Dr. McClure and the Title IX Officer's prompt meeting with Plaintiff, and their following up with him regarding the identity of his harasser, constitute specific and timely actions in response to Plaintiff's claims. Plaintiff provides no reason to conclude that Defendant had to do more for its response to qualify as an "investigation" within the meaning of the SOM manual.

Plaintiff essentially argues that he was entitled to a different, better investigation. Plaintiff claims that Defendant could have investigated his complaint by finding out what students were on the Executive Board and then determining which student was homosexual. Plaintiff himself refers to this as a "fishing expedition." (Doc. No. 39-1 at ¶ 98). The SOM manual makes no requirement or promise to Plaintiff that administrators will find out the name of the individual he is accusing of sexual misconduct, or that they will take any specific types of actions at all when investigating a complaint. The SOM manual leaves the discretion up to the Title IX Officer to make a thorough investigation, and here there were several valid reasons not to exercise discretion to seek out the identity of the harasser: the administration was unsure of who identified a homosexual, (*Id.* at ¶ 96), and Plaintiff indicated his harasser had a position at the school that did not exist, (*Id.* at ¶ 92).

19

And the Court is loath to conclude that Defendant was somehow derelict for not prying into its students' sexual orientations in order to determine who is and is not homosexual.

Plaintiff's contention that the contract was breached by Defendant's failure to impose discipline on Student M is unfounded. Even if Defendant had known the name of this student, the SOM manual indicates that punishment occurs only at Step Three (after an investigation and informal resolution)—and even then only "if initiated." (Doc. No. 32-2 at 575). In other words, punishment may or may not occur, and if it does occur, it occurs only if Step Three is initiated. Thus, the SOM manual does not indicate that punishment is automatic upon a student making Defendant aware of a sexual harassment allegation, and Plaintiff does not point the Court to anything else that so indicates.

Additionally, the Court deems unfounded Plaintiff's allegation that the implied contract was breached because Defendant ordered his academic dismissal without considering that he suffered harassment. First, Plaintiff has pointed the Court to no indication, in the SOM manual or elsewhere, that such consideration was required before dismissing him for repeated academic issues. It is undisputed that Plaintiff was informed that failing more than 12 credit hours would result in a recommendation of dismissal for poor academic performance, and that Plaintiff failed more than 12 credit hours in the fall 2017 semester, resulting in an academic dismissal. (Doc. No. 39-1 at ¶¶ 33, 34, 38, 39). Second, the Court is not inclined to second-guess the academic dismissal of a student, and instead gives great deference to the school in making such a decision, especially when that school operates in the health care field. *Doherty*, 862 F.2d at 576.

### 2. Other Claims of Breach of Contract

In his Complaint, Plaintiff makes various other claims for breach of his implied contract. Plaintiff does not address these claims in his motion for summary judgment, and he does not point

20

the Court to any dispute of material fact. The claims, though not clearly stated or organized, seem to fall into two categories: 1) breach of obligation to provide education and instruction and to abstain from arbitrarily imposing punishment or interfering with his education, and 2) breach of the obligation to provide a meaningful right of appeal of his academic dismissal. (Doc. No. 1 at 8-10). As for the first claim, Plaintiff argued that Defendant gave him certain bad grades, allowed cadavers to thaw in violation of health codes, did not require him to repeat classes he failed, dismissed him for failing a class, allowed other students to retake classes, re-enrolled students who cheated, did not prepare teachers to teach their courses, enrolled more students than MMC was accredited to teach, and used unaccredited curriculum and unrelated test questions. (Doc. No. 1 at 6, 8-10). As for the dismissal, Plaintiff claimed that he had the right to appeal his dismissal in person before a dismissal committee, but he received a phone call instead of an in-person appeal; the Dean refused to explain some of his failing grades; and "his appeal was a sham." (*Id.* at 10).

A claim for educational malpractice, whereby a plaintiff challenges the adequacy of his or her education, is not recognized as a cause of action under Tennessee law. *Atria*, 142 F. App'x at 251; *McMillin v. Lincoln Mem'l Univ.*, No. E201001190COAR3CV, 2011 WL 1662544, at *6 (Tenn. Ct. App. May 3, 2011); *Hutchings v. Vanderbilt Univ.*, 55 F. App'x 308, 310 (6th Cir. 2003) ("[Plaintiff's] claims concern the adequacy of the educational services provided by the University. Courts are not inclined to review educational malpractice claims or breach of contract claims based on inadequate educational services."). In alleging that MMC did not provide quality education and instruction and interfered with his education, Plaintiff is essentially attempting to bring a (non-cognizable) claim for educational malpractice. The Court therefore will dismiss these breach of contract claims as a matter of law. To the extent that Plaintiff indicates that he is entitled to relief based on bad grades or receiving academic treatment worse than that received by other students,

21

the Court again is not inclined to second-guess the academic dismissal of a student; instead, as noted above, it gives great deference to the school in making such a decision, especially when that school operates in the health care field. *Doherty*, 862 F.2d at 576.

As for Plaintiff's claim that the appeal process of his dismissal was inadequate, the SOM manual lays out the appeal process that Plaintiff seems to be contesting. The SOM manual states that a student "has the right to appeal a decision." (Doc. No. 32-3 at 548). The procedure states that the Dean will hear the appeal within ten calendar days, that the Dean will evaluate the merits of the appeal claim without rehearing the case itself, and that the Dean will uphold or overturn the dismissal. (*Id.* at 549). Plaintiff complains not that his appeal was untimely or badly considered, but rather that he was denied an in-person appeal with the Dean and "meaningful appeal" to which he allegedly was entitled.[14] (Doc. No. 1 at 10). But Plaintiff does not dispute in his Response to Defendant's Statement of Undisputed Facts that the SOM manual does not require the Dean to meet with dismissed students in person or by telephone prior to rendering a decision on the appeal. (Doc. No. 39-1 at ¶ 45). Therefore, Plaintiff has pointed the Court to nothing in the SOM manual that would have entitled him to a better appeal process, and Plaintiff has not disputed that the SOM manual did not entitle him to an in-person appeal with the Dean. The Court finds that as a matter of law Defendant complied with the terms of the implied contract by giving Plaintiff an avenue of appeal.

---

[14] Plaintiff also mentions this theory twice in passing in his Response to Defendant's Motion, when discussing IIED and gross negligence. (Doc. No. 39 at 11, 16).

For the reasons discussed, the Court cannot find that Defendant breached its implied contract with Plaintiff.[15]

---

[15] Plaintiff argues at various points that Defendant has breached the covenant of good faith and fair dealing. *E.g.*, (Doc. No. 1 at 7). In Tennessee, "there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement." *Doe. v. Vanderbilt Univ.*, 2019 WL 4748310 at *15 (quotation omitted). However, this duty is not an independent cause of action. *Id.* In a context similar to the one presented here, another judge on this Court has stated that "the implied covenant of good faith and fair dealing creates a duty to provide basic fairness, and that duty can be met by complying with the terms of the Handbook generally, and the disciplinary process in the Sexual Misconduct Policy specifically, that are designed to be fair." *Id.* So one way of looking at this, according to at least two cases from this court, is to say that Plaintiff has not sufficiently shown that the implied contract has been breached, and so the Court cannot find that Plaintiff has raised a genuine issue as to whether Defendant breached the covenant of good faith and fair dealing. *See id.*; *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d at 699-700.

But there is also another, more general way of looking at this that ultimately dictates the same result. Under this approach, one begins by asking: if this covenant does not serve as the basis for an independent cause of action, one might reasonably wonder, what does it do? The undersigned previously has explained the answer this way:

> While the implied covenant does not create new contractual rights or obligations, it protects the parties' reasonable expectations as well as their rights to receive the benefits of their agreement. Thus, "there is an implied covenant of good faith and fair dealing in every contract, whereby neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." The general idea, at least in pertinent part, seems to be that one party cannot in bad faith get in the way of the counterparty's satisfaction of a contract condition that would result in the counterparty's realization of a benefit under the contract. In the Court's view, the following hypothetical demonstrates the principle. If a landowner agrees to pay a painter a $10,000 commission if she completes a "satisfactory" landscape of the landowner's estate, the landowner breaches the covenant of good faith and fair dealing—and thus the contract—if he stops allowing the painter onto his estate after the painter has completed most of the painting; the covenant protects the painter from the argument that she, not having "completed" a "satisfactory" landscape, is contractually not entitled to a commission.

*Walton v. Interstate Warehousing, Inc.*, No. 3:17-CV-1324, 2020 WL 1640440, at *9 (M.D. Tenn. Apr. 2, 2020) (citations omitted). Under this approach, one next asks what exactly Defendant did here to interfere with Plaintiff's rights to receive the fruits of his implied contract with Defendant? To the extent Plaintiff would answer that Defendant breached an alleged term of the implied contract, Plaintiff is relying on the contractual terms themselves and not on the covenant of good faith and fair dealing at all. To implicate the covenant of good faith and fair dealing in any sense

23

c. Damages

Additionally, the Court finds that Plaintiff's damages calculation is speculative. Tennessee courts have held that in cases involving dismissal in higher education, "contract damages are impermissibly speculative." *Doe v. Belmont Univ.*, 334 F. Supp. 3d at 901 ("Tennessee breach of contract law exists to make [Plaintiff] whole, not to provide him with an unquantifiable windfall for the future. Accordingly, [Plaintiff] has not adequately pleaded damages for the several alleged breaches that survived the above analysis."); *Kindred v. Nat'l Coll. of Bus. & Tech., Inc.*, No. W2014-00413-COA-R3CV, 2015 WL 1296076, at \*5-7 (Tenn. Ct. App. Mar. 19, 2015) (noting the uncertainty of plaintiff passing each course, graduating, and obtaining employment when ruling damages speculative); *Canady v. Meharry Med. Coll.*, 811 S.W.2d 902, 907 (Tenn. Ct. App. 1991) (noting "the failure of plaintiff to realize his dream is too speculative and subject to too many future variables to show a proximate causal relationship between the irregularities and the claimed injury").

Plaintiff claims that he is entitled to $32,476,162 in lost income damages due to his dismissal from MMC. (Doc. No. 32-3 at 598). Defendant notes that "Plaintiff's damages calculation assumes that he would have (1) successfully graduated medical school, (2) completed all the required testing associated with earning a medical degree, and (3) matched for a residency in orthopedics. Given Plaintiff's demonstrated academic performance, these assumptions are

---

that adds anything to his breach of contract claim not already present based on the terms of the implied contract, Plaintiff must identify something Defendant has done (beyond breaching one or more terms of the implied contract) that get in the way of Plaintiff enjoying his rightful benefits under that contract. The Court does not see where Plaintiff has done any such thing, and so his invocation of the covenant of good faith and fair dealing is for naught.

simply unsupported." (Doc. No. 46 at 4). The Court agrees with Defendant, and the Court finds

that Plaintiff's damages calculation would not be allowed because it is speculative.

For the reasons discussed, the Court will grant Defendant's motion for summary judgment

with respect to Plaintiff's contractual claims (Count I).

B. Promissory estoppel

"A plaintiff may establish a claim for promissory estoppel by demonstrating that: 1) a party

made a promise which the promisor should reasonably have expected to induce the action or

forbearance of the promisee; 2) the promise does induce such action or forbearance; and 3)

injustice can be avoided only by enforcement of the promise." *Atria*, 142 F. App'x at 256 (citing

*Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn.1982)). To be enforceable, a promise must be

"unambiguous and not unenforceably vague." *Smith v. Hi-Speed, Inc.*, 536 S.W.3d 458, 483 (Tenn.

Ct. App. 2016) (quotation omitted). As indicated above, the promissory estoppel theory has been

characterized as one asserting a contract implied in law (as opposed to a contract implied in fact).

"In Tennessee, the doctrine of promissory estoppel is not liberally applied."[16] *Kinard v. Nationstar*

*Mortg. LLC*, 572 S.W.3d 197, 210 (Tenn. Ct. App. 2018).

---

[16] Defendant cites case law indicating that promissory estoppel is not available when a valid contract exists between two parties. (Doc. No. 35 at 23-24 (citing *Jones*, 2017 WL 2972218, *9)). This line of cases typically refers specifically to promissory estoppel being unavailable when there is an express contract. *Sparton Tech., Inc. v. Util-Link, LLC*, 248 F. App'x 684, 689-90 (6th Cir. 2007). And in this case, the Court has not found an express contract, but rather an implied contract. And when presented with potentially finding an implied contract and promissory estoppel in the same case, Tennessee courts have not balked at the possibility. *E.g.*, *EnGenius Entm't, Inc. v. Herenton*, 971 S.W.2d 12, 21 (Tenn. Ct. App. 1997); *Wilson v. Smythe*, No. M2003-00645-COA-R3CV, 2004 WL 2853643 (Tenn. Ct. App. Dec. 10, 2004). However, under similar circumstances, a judge of this Court has found that a promissory estoppel claim failed when it was premised on essentially the same allegations underlying a claim of breach of a contract implied from a student handbook. *Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 902 (M.D. Tenn. 2018) ("[Plaintiff's] wide-ranging promissory estoppel claim fails because, as discussed above, there is an implied contract

Defendant argues that there was never an enforceable promise between it and Plaintiff. (Doc. No. 35 at 24). Plaintiff argues that he relied on the promise of a list of enrolled students in January 2018, and he returned to Nashville because of this "promise that he would be allowed to finish his classes for the academic year." (Doc. No. 33 at 9). Plaintiff additionally received emails from some of his professors indicating he was still listed in their courses for the spring semester. (Doc. No. 32-3 at 507, 510).[17] Plaintiff took out loans for the spring 2018 semester, which were eventually returned to the lender, except for those used for housing. (Doc. No. 41 at ¶¶ 55, 56, 57). Plaintiff claims that because Defendant did not issue its final denial of Plaintiff's appeal until after he paid tuition, his promissory estoppel claim should prevail. (Doc. No. 33 at 9-10).

The Court finds that there was not a promise which Defendant should have reasonably expected to induce the action or forbearance of Plaintiff. Plaintiff repeatedly refers to the list of enrolled students from January as a "promise" to him that he was allowed to return. But even if a

_____

between [Plaintiff] and [Defendant] that is reflected in the terms of the Bruin Guide, and the promissory estoppel claim is premised on essentially the same allegations that support Doe's breach of contract claim."). But ultimately the Court believes that where, as here, a court on motion for summary judgment (a) has found the existence of an implied contract, and yet (b) has granted the defendant summary judgment on the plaintiff's breach of (an implied in fact) contract, the court should consider a separate claim of promissory estoppel to determine whether it survives summary judgment. The Sixth Circuit has clearly suggested, without holding, as much. *See Atria.* 142 F. App'x at 256.

Regardless of whether his implied contract theory precludes his promissory estoppel theory, the Court would find promissory estoppel inapplicable to the extent based (as suggested at Doc. No. 1 at 10-11) on alleged promises set forth the SOM manual. Promissory estoppel would be inapplicable in this regard because Plaintiff has not pointed the Court to any action or forbearance he took as a result of the SOM manual. Due to such lack of demonstrated reliance, the Court would not find this to be one of the rare cases where promissory estoppel is applicable. *Jones*, 2017 WL 2972218, at *9. The Court will, however, consider Plaintiff's claim for promissory estoppel based on the list of enrolled students, because this list has not been the basis of an claim of breach of (an implied) contract and because Plaintiff does allege an action taken in reliance on Defendant's alleged promise purportedly conveyed via this list.

[17] Notably, in each of these email exchanges, Plaintiff acknowledges that he was dismissed and does not state that he believes he is a student enrolled for the spring semester.

26

list of enrolled students is a promise—which seems a dubious proposition—it is at best an ambiguous and vague one, and it does not make a clear promise to Plaintiff. *See Smith*, 536 S.W.3d at 483 (finding an oral promise to be vague when the "purported promise is too indefinite to support a basis for relief" and there was "no reference to other facts from which a sense of certainty can be established."); *see also Jackson v. CitiMortgage, Inc.*, No. W201600701COAR3CV, 2017 WL 2365007, at *9 (Tenn. Ct. App. May 31, 2017) (finding an email chain with no explicit promise insufficient to constitute a promise). Additionally, Plaintiff acknowledges that he knew as of December that he had been dismissed from the SOM, and yet Plaintiff cannot be deemed to have reasonably relied on an alleged promise to make out a claim of promissory estoppel if he had received pre-reliance notice that the alleged promise must be false because what was supposedly promised would not materialize. *See Kinard*, 572 S.W.3d at 210 (finding no promissory estoppel when plaintiffs' reliance on an instruction that they could withhold loan payments was not reasonable when they had been notified in writing that they were responsible for the loan payments).

As noted above, the Court is not to apply promissory estoppel liberally. The doctrine would have to be applied with hyper-liberality for it to apply here; thus, the Court finds as a matter of law that Plaintiff is entitled to relief under promissory estoppel. *Jones*, 2017 WL 2972218, at *9. Therefore, the Court finds that Defendant is entitled to summary judgment on Plaintiff's claim of promissory estoppel (Count II).

C. Intentional Infliction of Emotional Distress ("IIED")

A claim for IIED under Tennessee law is essentially a claim for outrageous conduct. *Lyons v. Farmers Ins. Exch.*, 26 S.W.3d 888, 893 (Tenn. Ct. App. 2000). There are three elements to this cause of action: "(1) the conduct complained of must be intentional or reckless; (2) the conduct

must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997) (quotation omitted). "To say that Tennessee courts narrowly define 'outrageous conduct' would be something of an understatement. The conduct must be 'atrocious,' 'utterly intolerable,' and 'beyond all bounds of decency.'" *Doe v. Belmont Univ.*, 334 F. Supp. 3d at 903 (quoting *Goldfarb v. Baker*, 547 S.W.2d 567, 569 (Tenn. 1977)). One Tennessee court described the high standard as such:

> In describing these elements, we have emphasized that it is not sufficient that a defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress. A plaintiff must in addition show that the defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 51 (Tenn. 2004) (internal citation and quotation marks omitted).

Additionally, "recovery for intentional infliction of emotional distress is limited to mental injury which is 'so severe that no reasonable [person] would be expected to endure it.'" *Arnett v. Domino's Pizza I, L.L.C.*, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003) (quoting *Miller v. Willbanks*, 8 S.W.3d 607, 615 n. 4 (Tenn. 1999)). "Tennessee courts have consistently held that removal from academic programs and frustration of earning academic degrees, even if humiliating, depressing, or distressful, are not sufficiently egregious to support a claim of IIED." *Doe v. Belmont University*, 334 F. Supp. 3d at 903 (collecting cases). Additionally, "[i]t is for the trial court to determine, in the first instance, whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. Thus, the trial court may reasonably dismiss

28

this legal theory as a matter of law."[18] *Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010) (internal citation omitted).

Defendant argues that Plaintiff cannot point to an action that was "intentional" or "reckless," and that Defendant displayed no "outrageous" conduct. (Doc. No. 35 at 24). In response, Plaintiff points to several events he posits constitute reckless and intentional harm: 1) the SOM failed to investigate his allegations of sexual misconduct, 2) he received three F's on his transcript that were arbitrary, and 3) he did not have a meaningful opportunity to appeal his dismissal. (Doc. No. 39 at 11).[19] Plaintiff states that "[n]one of these things happened by accident."

---

[18] Plaintiff argues that the Court should not dismiss this claim, because "[s]tandards applicable in IIED claims such as 'extreme and outrageous' and 'not tolerated in civilized society,' are, like 'negligence' and other variable standards which are based upon the common sense of the community, primarily for application by the jury." (Doc. No. 39 at 10-11). For this proposition, Plaintiff relies on *Moorhead v. J. C. Penney Co.*, 555 S.W.2d 713 (Tenn. 1977). There, the trial court dismissed the complaint on the grounds that it failed to state a cause of action. *Id.* at 714. The Supreme Court of Tennessee reversed, holding that the plaintiffs had made allegations that state a cause of action for IIED. *Id.* at 717. The Supreme Court held that the standards "extreme and outrageous" and "not tolerated in civilized society" are "primarily for application by the jury." *Id.* at 718. Though it is true that these standards would typically be applied by the jury in a trial, it is the job of the Court to determine, in the first instance, whether Plaintiff has made out a claim for IIED under the standards. *E.g.*, *Cunningham v. Vanderbilt Univ.*, No. 3:16-CV-00223, 2017 WL 1076478, at *5 (M.D. Tenn. Feb. 27, 2017), *report and recommendation adopted*, No. 3:16-CV-00223, 2017 WL 1064381 (M.D. Tenn. Mar. 21, 2017) (discussing *Moorhead* at length and granting motion to dismiss on IIED claim*); Finley v. Kelly*, 384 F. Supp. 3d 898, 914 (M.D. Tenn. 2019) (same). And so, then the issue may reach the jury, which would apply the standards. But if not, the issue does not reach the jury. Therefore, the Court finds that it can find as a matter of law that Plaintiff's IIED claim fails.

[19] In his complaint, Plaintiff points to a total of eight acts or omissions that he claims were done intentionally or recklessly: 1) failing to investigate allegations of sexual misconduct, 2) the inclusion of F (failing) grades on his transcript, 3) failure to require him to repeat the first eleven hours he failed, 4) failure to teach an accredited curriculum, 5) failure to provide adequately prepared educators, 6) Defendant's overenrolling of students, 7) Plaintiff's dismissal, and 8) failure to provide a meaningful appeal. (Doc. No. 1 at 12). Though the Court has focused its discussion on the three of these (numbers 1, 2 and 8) that are highlighted in Plaintiff's Response, the same analysis would apply to every one of the eight events listed in his Complaint, and the Court would find as a matter of law that none of them would support a claim of IIED. In brief, this is because

29

(*Id.*). Plaintiff claims that "Meharry's conduct rises to the level of outrageous because civilized society should not tolerate colleges and universities that accept hundreds of thousands of dollars in tuition from students, and then fail to provide the academic and / or professional educational opportunities that those students paid for." (*Id.*). As for damages, Plaintiff claims that:

> His father and various other relatives attended, and graduated from Meharry. MMC posits that Joiner suffered no identifiable mental injury, however, Joiner submits that the injury suffered by a child (Joiner), who is robbed of the opportunity to achieve the standards set by parents and family, is immeasurable in essence, and therefore appropriate for determination by the jury as a matter of fact, rather than a matter of law.

(*Id.*). Plaintiff cites no authority that such circumstances suffice to support an IIED claim. Indeed, he cite no authority supporting his IIED claim at all, other than his recitation of the prima facie case and some general case law (which the Court has outlined above).

Here, Plaintiff argues merely that the three failures he claims support his IIED claim did not happen "by accident" and that the conduct is "outrageous" because the school failed to provide academic services that Plaintiff paid for. However, as noted above, Tennessee courts have routinely held that removal from school resulting only in humiliation and disappointment[20] (which seems to be the crux of Plaintiff's argument) does not suffice to support an IIED claim. *Kindred*

---

none of these acts or omissions is unbelievably dreadful in the eyes of those living in a decent society, which is essentially what an IIED claim requires.

[20] Plaintiff saw a psychologist twice at Vanderbilt to address stress and anxiety. (Doc. No. 39-1 at ¶ 99). Plaintiff does not remember the psychologist's name, and he has put no evidence into the record regarding these visits. Plaintiff also has indicated (perhaps inaccurately referencing the undisputed visits to a psychologist) that he was at one time "admitted" to Vanderbilt Psychiatric Hospital, which Defendant disputes. (Doc. No. 41 at ¶ 43). Though Defendant argued in its briefing that the visits with the psychologist were insufficient evidence for an IIED, (Doc. No. 36 at 25), Plaintiff did not rely on or even mention these visits when arguing in support of his IIED claim. Even if Plaintiff had made this argument, the Court would find two visits to a psychiatrist, and the disputed admission to the psychiatric hospital, insufficient when Plaintiff has presented no evidence of these visits and no link between the visits and the events he claim rise to the level of IIED.

*v. Nat'l Coll. of Bus. & Tech., Inc.*, No. W2014-00413-COA-R3CV, 2015 WL 1296076, at *10 (Tenn. Ct. App. Mar. 19, 2015) (finding no IIED when plaintiff's enrollment for a term was cancelled, delaying the completion of her degree); *Runions v. Tennessee State Univ.*, No. M200801574COAR3CV, 2009 WL 1939816, at *6 (Tenn. Ct. App. July 6, 2009) (finding no IIED when plaintiff was expelled from a nursing program because of her grades and she was physically removed from a classroom); *Goldfarb v. Baker*, 547 S.W.2d 567, 568 (Tenn. 1977) (finding no IIED when teacher wrongly accused plaintiff of assault, ejected him from class, and attempted to blackmail him).

Though Plaintiff's removal from school was undoubtedly a disappointment to him, that does not make it a valid IIED claim. Plaintiff has not shown the Court that the conduct was intentional or reckless, that the conduct was "outrageous," and that the conduct resulted in serious mental injury. Therefore, the Court finds that Defendant's motion should be granted with respect to Plaintiff's IIED claim (Count III).

### D. Negligence

In Tennessee, a negligence action requires a plaintiff to establish each of five elements: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, causation." *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000). A court should not allow a plaintiff to pass off as tort claims the same claims pled as breach-of-contract claims. *Doe v. Vanderbilt*, 2019 WL 4748310, at *19 (noting that plaintiff's negligence claim was "an impermissible attempt to recast his contractual claims in the language of tort"); *see also Valente v. Univ. of Dayton*, 438 F. App'x 381, 387 (6th Cir. 2011); *Pierre v. Univ. of Dayton*, No. 3:15-CV-362, 2017 WL 1134510, at *9 (S.D. Ohio Mar. 27, 2017).

31

Defendant argues that Plaintiff's negligence claim fails because (a) it is just a recasting of his contract claim as a tort claim, and (b) Plaintiff has not identified a duty of care that Defendant owes him. (Doc. No. 35 at 26). Defendant additionally claims that Plaintiff cannot show that actions of Defendant fell below the standard of care. (*Id.*). Plaintiff responds that Defendant owed him a duty of care, Defendant breached that duty, that he has suffered damages, and that the requisite causation is present. (Doc. No. 39 at 12-14). In his Complaint, Plaintiff states that Defendant owed him a duty of care *during the student disciplinary process*, but he then seems to extend this duty when discussing breach, claiming that the duty of care was breached when Defendant failed to investigate Plaintiff's sexual misconduct complaint, mishandled his grades, and mishandled his academic disciplinary procedure. (Doc. No. 1 at 12). In his Response, Plaintiff focuses on his academic dismissal, his claim that Defendant pushed him not to withdraw from school, and the effect the sexual harassment had on his grades. (Doc. No. 39 at 13). Therefore, Plaintiff brings in tort substantially the same claims (his academic dismissal and the handling of his sexual harassment allegation) he brought under a breach-of-contract theory.[21] The Court will therefore not consider these tort claims. *See Doe v. Vanderbilt*, 2019 WL 4748310, at *19. Additionally, the Court notes that Plaintiff's claim, to the extent it hinges on his academic dismissal and grading, would fail for the reasons discussed previously, as the Court is not inclined to second-guess the academic dismissal of a student, and instead gives great deference to the school in

---

[21] The authority cited by Plaintiff in his response, with the exception of *Atria*, amounts only to general negligence law. In *Atria*, the Court did consider both contractual and negligence claims against a school, but the negligence claims were founded on circumstances (the manner in which a teacher returned test papers) entirely different from those on which the contract claims were founded (the manner in which the school handled the Honor Council rules during the student's hearings). *Atria*, 142 F. App'x at 251, 254.

making such a decision, especially when that school operates in the health care field. *Doherty*, 862 F.2d at 576.

Therefore, the Court will grant Defendant's motion for summary judgment on Plaintiff's negligence claim (Count IV).

### E. Negligent Infliction of Emotional Distress ("NIED")

To make out a claim of NIED in Tennessee, a Plaintiff must:

> (1) satisfy the five elements of ordinary negligence: duty, breach of duty, injury or loss, causation in fact, and proximate or legal cause; (2) establish a "serious" or "severe" emotional injury; and (3) support his or her serious or severe injury with expert medical or scientific proof. A "serious" or "severe" emotional injury is one that occurs where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.

*Marla H. v. Knox Cty.*, 361 S.W.3d 518, 529 (Tenn. Ct. App. 2011) (internal citations and quotation marks omitted). The Court will not rehash its discussion of Plaintiff's negligence claim, which is the first element of Plaintiff's NIED claim. The Court additionally notes that Plaintiff has not established a sufficiently "serious" or "severe" emotional injury, and he has not supported his injury with any medical or scientific proof. Plaintiff claims that "the confluence of the sexual harassment and corresponding academic struggles, viewed in the light most favorable to [Plaintiff], create a genuine issue of material fact." (Doc. No. 39 at 15). Even if the sexual harassment was directly linked to (or the sole cause of) Plaintiff's academic struggles, Plaintiff's claim would still fail as a matter of law because he has not established "serious" emotional injury, he has not supported it with medical or scientific proof, and he has not made out a negligence claim.

Therefore, the Court will grant summary judgment to Defendant on Plaintiff's NIED claim (Count V).

### F. Gross Negligence

In Tennessee, in order to prevail on a claim of gross negligence:

> a plaintiff must first establish that the defendant engaged in conduct that amounts to ordinary negligence. In addition to proving that the defendant has committed a negligent act, the plaintiff must prove that the act was done with utter unconcern for the safety of others, or one done with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law. Gross negligence is defined as a conscious neglect of duty or a callous indifference to consequences or such entire want of care as would raise a presumption of a conscious indifference to consequences.

*Thrasher v. Riverbend Stables*, No. M200701237COAR3CV, 2008 WL 2165194, at *5 (Tenn. Ct. App. May 21, 2008) (internal citations and quotation marks omitted). Again, the Court will not rehash its discussion of negligence, which Plaintiff must show to establish his gross negligence claim. In addition to failing to establish a negligence claim, which alone proves fatal to Plaintiff's claim for gross negligence, Plaintiff points the Court to no specific "act" of Defendant that could potentially rise to the level of gross negligence. Instead, Plaintiff seems to argue that Defendant's actions, taken as a whole, rise to the level of gross negligence; Plaintiff asserts that "[t]aken together, and viewed in the light most favorable to Plaintiff, whether Meharry's actions and omissions demonstrate a reckless disregard for [Plaintiff's] rights, and a conscious indifference to the consequences of that disregard, is a question for the jury." (*Id.*). But Plaintiff has not pointed the Court to any specific acts or omissions of Defendant that, even cumulatively, could be considered grossly negligent or in reckless disregard of Plaintiff's rights.

The Court will grant summary judgment to Defendant on the issue of gross negligence (Count VI).

### G.  Negligent Training and Supervision of Employees

"Under Tennessee law, a negligent training or supervision claim may be maintained by establishing the elements of a negligence claim, plus the additional element that the employer had

34

knowledge of the employee's unfitness for the job." *Doe v. Vanderbilt Univ.*, 2019 WL 4748310, at *20. In addition to not having made out a negligence claim, Plaintiff has submitted no evidence regarding Defendant's training of employees (or lack thereof), that Defendant's employees were unfit, or that Defendant had knowledge of such unfitness. Plaintiff has not shown the Court a genuine dispute of material fact on this claim.

The Court will grant summary judgment for Defendant on Plaintiff's negligent training and supervision of employees claim (Count VII).

## H. Violations of Title IX

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Plaintiff claims that he would have been treated differently if he were a woman, and he brings claims under Title IX based on this alleged disparate treatment. (Doc. No. 1 at 16-19; Doc. No. 39-1 at ¶¶ 86, 87). Plaintiff moves for summary judgment on two counts under Title IX: 1) selective enforcement, and 2) deliberate indifference. Defendant moves for summary judgment on the same counts, plus on Plaintiff's claims for 1) declaratory judgment, and 2) erroneous outcome. The Court will discuss each of Plaintiff's Title IX claims in turn.

### 1. Selective enforcement

To make out a claim of selective enforcement, "the plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016). Therefore, Plaintiff must show

that a similarly situated female was treated more favorably because of her gender in order to prevail on this claim.

In an attempt to satisfy this burden, Plaintiff states in his memorandum of law in support of Plaintiff's Motion that "Plaintiff testified that when [Defendant] received complaints of sexual harassment from a female student, those complaints ultimately led to the dismissal of [Defendant's] employee Dr. [W, an SOM professor]." (Doc. No. 33 at 11). Plaintiff further states that "[t]he only difference in those two situations was the gender of the complainant." (*Id.*). However, Plaintiff completely mischaracterizes the testimony he gave and what was undisputed in each party's statement of facts. There is no evidence of record that this professor was dismissed for harassing *a female* student. Instead, Plaintiff musters only allegations that this professor harassed *students*. (Doc. No. 41 at ¶ 39 ("Plaintiff testified that 'Dr. W.' was dismissed from MMC due to complaints of sexual harassment against him."); Doc. No. 39-1 at ¶ 23 ("Plaintiff claims that in the fall of 2017, a professor was terminated for sexually harassing students, but he is not aware of whether students who complained provided the name of the professor.")).[22] In his deposition testimony, Plaintiff referred only to "students" bringing harassment allegations against the professor, with no indication of the gender(s) of the "students." (Doc. No. 36-1 at 32). Later, when asked whether he knew of any female student who complained of sexual harassment being treated differently than he was, or whether he knew of a female student who was sexually harassed, Plaintiff said that he "wouldn't know." (Doc. No. 36-1 at 37). Additionally, and totally undercutting his argument in his memorandum, Plaintiff stated in his Response to Defendant's Undisputed Statement of Facts that it was *undisputed* that "Plaintiff is not aware of any female

---

[22] The Court additionally notes that Defendant filed a late sealed exhibit with the Court indicating that the professor Plaintiff spoke of was not fired for sexual misconduct. (Doc. No. 50).

students at Meharry who complained of sexual harassment and were treated differently than Plaintiff." (Doc. No. 39-1 at ¶ 89).

Even if the students Plaintiff claims brought harassment complaints against a professor were female, there would be many differences that indicate that Plaintiff was not similarly situated to such female student(s). First, the other complaint was against a professor, not a student. The SOM manual itself contemplates that allegations against professors are different from those against students, noting that a student may face different sanctions than would an employee and that different policies guide the respective sanctions for these different situations. (Doc. No. 32-3 at 576). Second, Plaintiff has provided the Court with no information regarding whether the students named their harasser. Third, Plaintiff's testimony indicates that more than one student made allegations against the professor. Fourth, although Plaintiff seems to argue that the SOM should have (further) investigated[23] his claim even though he stated he was fine with the resolution without (further) investigation, Plaintiff did not indicate whether the students bringing allegations against the professor were amenable to an investigation. *Mallory v. Ohio Univ.*, 76 F. App'x 634, 641 (6th Cir. 2003) (finding summary judgment appropriate when the two situations had "significantly different" circumstances and turned on different questions); *Lipian v. Univ. of Michigan*, 453 F. Supp. 3d 937, 966 (E.D. Mich. 2020), *motion to certify appeal denied*, No. 18-13321, 2020 WL 3402013 (E.D. Mich. June 19, 2020) (finding an "anecdote" regarding another's situation with a "critical difference" from plaintiff's case to be insufficient for a claim of selective enforcement).

---

[23] As suggested above, although it is fair to say that Defendant did not conduct a full-scale investigation, it is not necessarily fair to say that Defendant did not conduct at least a minimal "investigation" within the meaning of the SOM manual.

Therefore, the Court finds that Defendant is entitled to summary judgment on Plaintiff's selective enforcement claim (Count IX), as Plaintiff has pointed the Court to no similarly situated female who was treated differently by Defendant.

2. Deliberate indifference

"The 'deliberate indifference' standard is applied where a plaintiff seeks to hold an institution liable for sexual harassment, and it requires the plaintiff to demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." *Mallory*, 76 F. App'x at 638; *Doe v. Miami Univ.*, 882 F.3d 579, 591 (6th Cir. 2018). A claim for student-on-student harassment must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999). Additionally,

> Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, to craft perfect solutions, or to adopt strategies advocated by parents. The test is objective—whether the institution's response, evaluated in light of the known circumstances, is so deficient as to be clearly unreasonable. The Sixth Circuit has repeatedly held that deliberate indifference is lacking where the evidence establishes that the school promptly responded to complaints, investigated the complaint, and either imposed discipline where an individual was found responsible for wrongdoing or took proactive steps to reduce the opportunity for future conduct.

*Doe v. Univ. of Kentucky*, 361 F. Supp. 3d 687, 699 (E.D. Ky. 2019), *aff'd*, 959 F.3d 246 (6th Cir. 2020) (internal citations and quotation marks omitted).

Here, Defendant reacted promptly to Plaintiff's complaint and met with him that same day. (Doc. No. 41 at ¶ 26; Doc. No. 39-1 at ¶ 75). Defendant additionally took a proactive step to reduce the opportunity for future harassment by moving Plaintiff to a different study group that same day. (*Id.*). Though Plaintiff alleges that the harassment continued, he gave Defendant no reason to

38

believe that it continued or that additional measures were needed to prevent the future conduct. (Doc. No. 39-1 at ¶ 84). Neither Plaintiff nor Defendant has pointed the Court to a dispute of material fact on this issue. Under these circumstances, where Defendant reacted quickly to Plaintiff's request and a step was taken to avoid future harassment, a jury could not find that Defendant's handling of Plaintiff's allegation was "so deficient as to be clearly unreasonable." *Doe v. Univ. of Kentucky*, 361 F. Supp. 3d at 699.

Therefore, the Court will grant summary judgment on Defendant's claim of deliberate indifference (Count X).

### 3. Erroneous Outcome

"A successful 'erroneous outcome' claim requires the plaintiff to show that the 'outcome of [the] University's disciplinary proceeding was erroneous because of sex bias.'" *Doe v. Cummins*, 662 F. App'x at 452 (quoting *Mallory*, 76 Fed. Appx. at 639).

In his Response to Defendant's Motion, Plaintiff states that he "did not plead erroneous outcome. There was no investigation, therefore, there was no outcome. [Plaintiff's] Title IX claims are properly pled as deliberate indifference and selective enforcement." (Doc. No. 39 at 22). But despite stating that he did not plead erroneous outcome, Plaintiff's Complaint includes a full two pages pleading an erroneous outcome claim (specifically denominated as Count XI) under Title IX. (Doc. No. 1 at 17-19). Counsel's representation to the Court here does not cut the proverbial mustard, and counsel is cautioned against making statements like this that are so obviously false. Plaintiff seems to have since abandoned this argument, as noted in his Response.

Regardless, the Court would find that Plaintiff's erroneous outcome claim could not survive a motion for summary judgment. Plaintiff has not produced any evidence of a disciplinary proceeding against him, but rather has only shown the Court evidence regarding his academic

proceedings. And as discussed above in the Court's discussion regarding selective enforcement, Plaintiff has given the Court no indication that there was gender bias in the handling of his harassment allegations.

Therefore, the Court will grant summary judgment on this claim (Count XI) as well.

### 4. Declaratory Judgment

Plaintiff brings a claim under the Declaratory Judgment Act, claiming that the student disciplinary process, including the Sexual Assault Policies and Procedures, violated Title IX because of the failure to conduct an appropriate investigation with a trained investigator, failure to provide an unbiased process and tribunal, and the failure to ensure Student M could not continue to interfere with Plaintiff's education. (Doc. No. 1 at 15).

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C.A. § 2201(a). The Supreme Court has held that the Declaratory Judgment Act "confer[s] on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). When determining whether a district court has properly exercised its discretion under the Declaratory Judgment Act, the Court of Appeals usually considers five factors:

> (1) whether the declaratory action would settle the controversy;
> (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata";

(4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and
(5) whether there is an alternative remedy which is better or more effective.

*Doe v. Vanderbilt Univ.*, 2019 WL 4748310, at *11 (citing *Grand Trunk W. R.R. Co. v. Consol. Rail Co.*, 746 F.2d 323, 326 (6th Cir. 1984)).

In Response to Defendant's Motion, Plaintiff merely argues that "[i]n the instant case, a declaratory action would serve the useful purpsoe [sic] of re-affirming for Meharry and other private colleges the importance of their obligation to investigate any and all reports of sexual harassment, regardless of the surrounding circumstances." (Doc. No. 39 at 17-18). Plaintiff's asserted policy purpose is not one of the factors used to guide the Court's decision whether to exercise its discretion. Plaintiff seems to be alluding to the second factor that the Sixth Circuit utilizes, but Plaintiff forgets the second half of the factor: "in clarifying the legal relations in issue." A declaratory judgment from this Court would not clarify the legal relationship between Plaintiff and Defendant (and, in fact, Plaintiff focuses his argument on the relationships between students and *other* private colleges). Moreover, even if Plaintiff could establish his position—*i.e.*, that the student disciplinary process violated Title IX here—there would be a more effective alternative remedy; specifically, Plaintiff would have the customary remedy of a judgment monetary damages, which would fully vindicate his rights without any need for the Court to "declare" anything.

Additionally, the Court has explained above that it will grant Defendant's Motion regarding Plaintiff's Title IX claims, meaning that there will remain no controversy before this Court as to Plaintiff's rights under Title IX and a declaratory judgment would therefore be improper. *See Doe v. Vanderbilt Univ.*, 2019 WL 4748310, at *11; *Doe v. Univ. of the S.*, 687 F. Supp. 2d at 760.

The Court will not exercise its discretion to issue a declaratory judgment, and it will grant summary judgment to Defendant on Plaintiff's declaratory judgment claim (Count VIII).

## CONCLUSION

For the reasons discussed above, Plaintiff's Motion will be denied, and Defendant's Motion will be granted.

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE